AMERICAN EMPLOYERS INSURANCE COMPANY V. MRS. ALICE M. WILLIAMS ET AL.

No. 6664. Decided June 10, 1936.
(94 S. W., 2d Series, 1147.)

*W. B. Handley* and *C. J. Shaeffer,* both of Dallas, for plaintiff in error.

In a suit for compensation, where the uncontroverted evidence showed that the deceased had been in the employment of the employer some three months prior to the accident, but after his discharge had been permitted to use employer's rent house and in return therefor he was to perform such duties around the machinery located on the premises, and received no other emuneration, the Workmen's Compensation Act had no application, since the only relationship between the parties was that of landlord and tenant. Woodson v. McLaughlin, 234 S. W., 185; Mackenzie v. Minis, 63 S. E., 900; Hill v. Staats, 187 S. W., 1039.

*E. W. Napier,* of Wichita Falls, for defendant in error.

Under the testimony the relationship of employer and employee existed and plaintiffs should be permitted to recover the compensation heretofore denied them by the Industrial Accident Board. Cheatham v. Riddle, 12 Texas, 112; Texas Emp. Ins. Assn. v. Teel, 40 S. W. (2d) 201; Lumberman's Rec. Assn. v. Henderson, 15 S. W. (2d) 565.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

This case involves the question of whether or not Robert F. Williams at the time of his death was an employee of G. W. Mennis, whose compensation insurance was carried by plaintiff in error, American Employers' Insurance Company. Judgment for compensation was rendered by the trial court in favor of his surviving wife and children, which judgment was affirmed by the Court of Civil Appeals. 66 S. W. (2d) 726.

The controlling evidence is practically undisputed. We shall briefly enumerate the pertinent facts to see if there was any evidence to support the finding of the jury that Williams was an employee of Mennis at the time of his death. Mennis was engaged in the production of oil and gas, and was owner of certain houses situated upon his lease which were occupied by his employees. Williams worked for Mennis some years, but about three months before his death was discharged and was dropped from the payroll. While working for Mennis he resided with his family in one of the houses situated upon the lease. Shortly after being discharged, Williams went to work for the Oklahoma Petroleum & Gas Company at a point some miles from the Mennis lease, and was being paid by that company wages at the rate of $4.50 per day for the time he worked.

The testimony relied upon by defendants in error tending to show that Williams continued to be employed by Mennis was given by Mrs. Williams. It was to the effect that after Williams was discharged a Mr. Price, Superintendent for Mennis, agreed that he might remain in the house and do certain work connected with the motor situated near the house. Her exact language is as follows:

"Well, he told my husband we would just go ahead and stay in the house and kind of look after the motor, you know, and grease the rod-lines once in a while when they needed it, and when the wells were leaking pack those boxes, or whatever they call them, and keep them from leaking."

There was no agreement that Williams was to be paid anything for his services, and while it is not stated that his services in looking after the motor were to be regarded as rent for the use of the house, yet it may be inferred that this was implied. There was no agreement as to how long this arrangement was to continue. The motor in question was located in a small house, a short distance from the house occupied by Williams and his family. It was supplied with electricity from a high power line which crossed the lease, the electricity being transmitted from the high power line to a bank of transformers, and then carried by wires to the house where the motor was situated. This motor was used in operating two oil wells owned by Mennis and situated near the motor house. There were wires running from the motor house to the house in which Williams lived by which electricity was transmitted for the purpose of furnishing lights in the house. These lights could be cut off by throwing a switch at the motor house. Likewise the motor could be cut off by throwing a switch.

Price, the Superintendent of Mennis, denied having made any agreement with Williams, but in view of the finding of the jury we disregard his testimony in this respect. He testified further, however, that he had on one or more occasions cut off the lights in the house by pulling the fuses and throwing the switch at the motor house. Notwithstanding this, Williams had put on the lights by putting a penny behind the plug at the switch. Price also testified that on Sunday before Williams was killed on Wednesday he had again cut off the lights by pulling the fuses and that he then told Williams to stay away from the motor house and to have nothing further to do with the motor or the lights. While Mrs. Williams testified that she did not hear this conversation between Price and Williams this

did not in any respect amount to a contradiction of the testimony of Price.

On the day of his death Williams left home early in the morning and went to the place of his labor as an employee of Oklahoma Petroleum & Gas Company. He reported for work and performed his usual duties for an hour or two when he was forced to quit on account of rain. He returned to the house about 5:30 o'clock in the afternoon. When he reached the house he was advised by his wife that the lights in the house were out, and he made a statement that he would go to the motor house and throw the switch. It appears that one of the wires leading from the motor house to the residence had fallen across a clothes line, and the inference is that this had been caused by a rainstorm during the afternoon. When about half way from the residence to the motor house Williams came in contact with the wire, presumably by taking hold of it with his hand, and was almost instantly killed.

The witness Price testified that although he had pulled the fuses and cut off the electricity from the wires leading to the house on Sunday preceding the accident and had instructed Williams not to have anything further to do with the motor or the lights, nevertheless shortly after the accident he examined the switch and found that someone had put a penny behind the plug in such a way as to make a contact and turn the electricity into the wires again. This testimony was not contradicted.

Our statute has defined "employee" as a person in the service of another under a contract of hire, expressed or implied, oral or written. The compensation allowed by law is based primarily upon and is determined by the average "weekly wages" of the one employed. In the present case it was shown that three months prior to the time Williams was killed he had been discharged by Mennis, acting through Price, and the circumstances were such as to clearly indicate he was wholly undesirable as an employee, so far as Price was concerned. He had performed no services for Mennis which were performed as a consequence of a contract of hire, and at the most what he did was referable to an agreement concerning the occupancy of the house. He had been paid no wages during this period. But if it could be said that the relation of employer and employee existed prior to Sunday before Williams was killed, it is evident that it terminated on that day, because Price testified that he emphatically told Williams to have nothing further to do with the motor, lights or machinery after that date. If, therefore, Williams was going to the motor house to throw the

motor switch, he was doing something he had been directed not to do. If he was going there to obtain light for his own personal use, against the instructions of Price, and in spite of the fact that Price had cut off the lights in the house, he was not injured in the course of his employment.

It is our conclusion that Williams was not an employee of Mennis at the time of his death, and therefore the judgments of the trial court and of the Court of Civil Appeals are reversed and judgment is here rendered in favor of the plaintiff in error.

Opinion adopted by the Supreme Court, June 10, 1936.